UNITED STATES of America

v.

Frank ANTICO

No. CRIM98–242.

United States District Court,
E.D. Pennsylvania.

Nov. 16, 2000.

Amy L. Kurland, Ass't U.S. Atty, Richard P. Barrett, Ass't U.S. Atty, Philadelphia, PA, for plaintiff.

Thomas Colas Carroll, Mark E. Cidrone, Philadelphia, PA, for defendant.

### ORDER & MEMORANDUM

DuBOIS, District Judge.

### ORDER

AND NOW, to wit, this 16th day of November, 2000, upon consideration of Defendant Antico's Motion for Continued Release Pending Appellate Disposition (Doc. 166, filed April 27, 2000), Government's Response to Defendant's Motion for Bail Pending Appeal (Doc. 174, filed May 5, 2000), and Defendant Antico's Reply Concerning Appellate Bail (Doc. 175, filed May 9, 2000), and related submissions, for the reasons stated in the accompanying Memorandum, **IT IS ORDERED** that Defendant Antico's Motion for Continued Release Pending Appellate Disposition is **GRANTED**.

### MEMORANDUM

## I. PROCEDURAL HISTORY

On September 30, 1998, a grand jury in the Eastern District of Pennsylvania returned a 19 count superceding indictment charging Frank Antico ("defendant") with: racketeering in violation of 18 U.S.C. § 1962(c) (Racketeer Influenced and Corrupt Organizations Act, "RICO") (Count 1); Hobbs Act Extortion in violation of 18 U.S.C. § 1951 (Counts 2–10); wire fraud in violation of 18 U.S.C. § 1343 (Counts 11–18); and criminal forfeiture pursuant to 18 U.S.C. § 1963 (Count 19). On May 11, 1999, following a fifteen day trial, a jury convicted defendant on all counts of the indictment.

On April 28, 2000, the defendant was sentenced to concurrent terms of 63 months imprisonment on Counts 1 through 10, and to concurrent terms of 60 months imprisonment on Counts 11 through 18, to run concurrently with the sentence imposed on for Counts 1 through 10. In addition, defendant was sentenced to three years supervised release, a fine of $10,000, and a special assessment of $1000, and ordered to forfeit $52,900.

On April 27, 2000, the defendant filed a motion for continued release pending appeal. On May 4, 2000 defendant filed a timely notice of appeal.

## II. STANDARD FOR BAIL PENDING APPEAL

Under Federal Rule of Appellate Procedure 9(c), the decision to release a person sentenced to a term of imprisonment pending appeal is governed by 18 U.S.C. § 3143. Under that statute, the defendant must satisfy two requirements in order to be released pending appeal: (1) the defendant must satisfy the court, by clear and convincing evidence, that he is unlikely to flee or pose a danger to the safety of any other person or the community if released; and (2) the defendant must establish that his appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal, an order for a new trial, a sentence that does not include a term of imprisonment or a reduced sentence less than the total of time served. 18 U.S.C. § 3143(b); *see also United States v. Miller*, 753 F.2d 19, 24 (3d Cir.1985). Release should be granted only if the decision on appeal of the "substantial question," if resolved in the defendant's favor, would be likely to result in reversal or an order for a new trial "of all counts on which imprisonment has been imposed." *Id.*

A substantial question within the meaning of § 3143 is one that is "fairly debatable" on which reasonable jurists might dis-

agree.[1] *See United States v. Smith*, 793 F.2d 85, 89–90 (3d Cir.1986). Another way of looking at the substantial question standard is to ask whether the question is "adequate to deserve encouragement to proceed further." *Id.* (*quoting Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 3394 n. 4, 77 L.Ed.2d 1090 (1983) (citations omitted)). The term "likely to result" in reversal does not mean that the court must act as a "bookmaker," predicting the outcome of defendant's appeal. *See Miller*, 753 F.2d at 23. Rather, the term means that the court must consider whether the defendant raises a "substantial question of law or fact" and, if so, the likelihood that acceptance of his arguments on appeal would result in either a reversal or an order for new trial.

The *Miller* test first requires the court to determine whether the defendant is likely to flee or to pose a danger to the community. It then requires a determination as to whether the appeal is for purposes of delay. *See Miller* at 24. The government does not challenge defendant's assertions that he is unlikely to flee, and that the appeal is not for purposes of delay. Rather the government disputes whether defendant has raised a substantial issue likely to result in reversal or an order for a new trial on all counts. It is to this question which the Court now turns.

## III. SUBSTANTIAL ISSUE LIKELY TO RESULT IN REVERSAL OR NEW TRIAL

### A. Counts 1 through 10—RICO and Hobbs Act Extortion

Defendant's first argument on appeal is that defendant is entitled to a new trial because the Court erred in declining to give the jury inducement and *quid pro quo* instructions on the extortion charges.

■ Defendant argues that the crime of color of office Hobbs Act extortion with which he was charged requires inducement. To support his claim, defendant points to the dissenting opinion in *Evans v. United States*, 504 U.S. 255, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), which would require inducement as an element of the crime. However, this assertion is contrary to existing law as set forth in the majority opinion in *Evans*. *See* 504 U.S. at 266, 112 S.Ct. at 1888. Accordingly, this claim does not rise to the level of a "substantial question of law or fact" as required by *Miller*.

■ Defendant relies on *United States v. Sun–Diamond Growers of California*, 526 U.S. 398, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999), in arguing that the Court should have instructed the jury that in order to convict defendant of Hobbs Act extortion under 18 U.S.C. § 1951, they must find a *quid pro quo*. In *Sun–Diamond Growers*, the Supreme Court held that in order to establish a violation of 18 U.S.C. § 201(c)(1)(A), the "illegal gratuity statute," the government must prove "a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 414, 119 S.Ct. at 1411. Under this analysis, the government must establish a direct *quid pro quo* between a gift received and an official act.

The government relies on *Evans v. United States* in which the Supreme Court held that a *quid pro quo* is not an element of Hobbs Act extortion in the context of campaign contributions. *See Evans*, 504 U.S. at 268, 112 S.Ct. at 1889. The government also points to several cases from outside the Third Circuit, as well as one from the Eastern District of Pennsylvania, which held that a *quid pro quo* is not required in non-campaign contribution extortions. *See, e.g., United States v. Delano*, 55 F.3d 720, 1995 WL 299867 (2d Cir. May 16, 1995); *United States v. Blandford*, 33 F.3d 685, 696–98 (6th Cir.1994); *United States v. Davis*, 967 F.2d 516 (11th

1. The Third Circuit has rejected the approach taken by some circuits which says that a "fairly debatable" question is a "close" question or one that could be decided either way. *See United States v. Smith*, 793 F.2d 85, 89 (3d Cir.1986).

Cir.1992); *United States v. McDade*, 827 F.Supp. 1153, 1171–72 (E.D.Pa.1993), *aff'd in part and rev'd in part*, 28 F.3d 283 (3d Cir.1994). However, the issue of *quid pro quo* has never been addressed by the Third Circuit. Furthermore, none of these cases cited by the government were decided after *Sun–Diamond* was issued in 1999.

Defendant makes the argument that, although not directly on point, the *Sun–Diamond* decision altered the law governing the proof required to sustain his conviction for extortion under color of official right under § 1951. He argues that *Sun–Diamond* requires a *quid pro quo* instruction to the jury. During trial, the Court considered this point, but rejected adding a *quid pro quo* element to the jury instructions.

Upon reconsideration, the Court concludes that there is some force in defendant's contention that *Sun–Diamond* could have altered the law in this area. There is certainly enough force to conclude that, in light of *Miller*, the defendant has raised a "substantial question of law or fact" within the meaning of § 3143(b)(2). The Court now turns to the question of whether a determination of error as to this issue by the Court of Appeals is "likely to result in reversal or an order for new trial."

If defendant were to prevail on this issue, this Court concludes it would likely result in an order for a new trial. The Supreme Court has held that the omission of an element of a crime in a jury charge is subject to harmless error analysis. *See Neder v. United States*, 527 U.S. 1, 15, 119 S.Ct. 1827, 1837, 144 L.Ed.2d 35 (1999). The test for harmless error is whether it is beyond a reasonable doubt that the error did not contribute to the verdict. *Id.* Applying this standard, the Court can not say that the omission of the *quid pro quo* charge, if required, was harmless error. Otherwise stated, it cannot be said beyond a reasonable doubt that a jury given a *quid pro quo* instruction would return a guilty verdict under the evidence presented.

Should the Third Circuit agree with defendant that *quid pro quo* is an essential element of the crime of color of office Hobbs Act extortion, the defendant would likely be entitled to a new trial on all of the extortion counts, Counts 2 through 10. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). Moreover, if conviction on the extortion counts is reversed, and a new trial granted, a new trial would also likely be granted in the RICO count, Count 1, because that conviction was based, in substantial part, on the extortion charges.

## B. Counts 11 through 16—Liz Riccardi Mail/Wire Fraud Scheme

Defendant was convicted on six counts of mail and wire fraud under 18 U.S.C. § 1343 for defrauding Philadelphians out of his honest services by having a financial interest in a business run by his girlfriend, Elizabeth Riccardi, that did business with the Department of Licenses and Inspection ("L & I"). Defendant argues that he did not defraud Philadelphians out of his honest services because no prohibited financial interest was created through his dealings with Riccardi, and was entitled to a new trial on these counts. Defendant also contends that the Court erred in not dismissing the racketeering acts and substantive counts pertaining to the honest services fraud scheme involving Elizabeth Riccardi. He claims that the evidence failed to demonstrate the existence of active fraud.

The government's theory, relating to honest services, was that defendant, then married, set up his girlfriend, Elizabeth Riccardi, in an expediting business in lieu of paying her $60 per week in child support for their two children. Typically, an expediting business involves having an "ex-

peditor" help license applicants prepare their license applications, for a fee. The expeditor generally brings the applications to someone in L & I to be processed ahead of other applications, as a way to circumvent L & I's "first come, first serve" policy. For such handling of applications, the L & I official would receive a fee from the expeditor.

In her role as an expeditor, Riccardi followed the usual procedure for expeditors, and brought applications to defendant or his designees, but did not pay the customary fee. Defendant had a clear stake in Riccardi's business—the more money she made, the less he had to contribute to the support of their children. Defendant referred clients to her, prepared the permit applications, moved the applications ahead of those who did not use Riccardi's service, and approved the permits. (Pl.'s Appellate Br. at 46). His financial stake in that business, being intimately tied to his child support obligations, deprived citizens of Philadelphia of their intangible right to disinterested decision making.

Defendant, on the other hand, argues that totaled together, his child support obligations would have totaled no more than approximately $31,000, and since Riccardi made over $700,000 in the expediting business beginning in 1986, his child support obligation had been paid off well before the dates charged in the indictment, all in 1993; he argues that the rest of the money was simply a nepotistic gift to his girlfriend, an act which was not illegal, rather than constituting a discharge of debt.

This Court does not believe there was any error with respect to the jury conviction on the mail and wire fraud counts involving Riccardi. The evidence presented at trial was sufficient to establish beyond a reasonable doubt that defendant engaged in a scheme to defraud Philadel-

phians out of their right to his loyal, faithful and honest services. Furthermore, even if the Court required a showing of "active fraud" as the defendant contends, there was sufficient evidence presented to show that defendant engaged in such activity on a pervasive scale with the intent to defraud.

██ Defendant also argues that this Court erred at sentencing in determining the amount of the loss resulting from the Riccardi fraud. It is his position that the Court should have used the amount of the gain to defendant, approximately $31,000, which represents the amount in child support obligations he did not have to pay to Riccardi as a result of the income she received from her expediting business. The Court disagreed with defendant at sentencing and calculated the sentence based on a loss of $700,000, the gain to Riccardi.

If the Third Circuit determines that this Court used an incorrect loss figure in calculating defendant's sentence, and the defendant's conviction on the other counts is reversed, the appeals process is likely to result in "a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeals process." 18 U.S.C. §§ 3143(b)(1)(B)(iii), (b)(1)(B)(iv).

Using the approximately $31,000 figure, as argued by defendant, a conviction involving fraud or deceit of more than $20,000, but less than $40,000, would likely result in a total offense level of 10 under the Sentencing Guidelines.[2] A total offense level of 10 in criminal history category 1, defendant's likely criminal history category, would result in a Zone B term of imprisonment of 6–12 months. *See* USSG Ch. 5, Pt. A, Sentencing Table, "If the

---

**2.** The base offense level for a conviction of fraud under the Sentencing Guidelines is 6. United States Sentencing Guidelines Manual (USSG) § 2F1.1(a) (2000). There is a 4 level enhancement because the amount of the loss is between $20,000 and $40,000. USSG § 2F1.1(b)(1)(E).

applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by ... [*inter alia*] (3) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment...." *See* USSG § 5C1.1(c)(3).

A likely outcome, should the Third Circuit determine that this Court should have used the approximately $31,000 figure, could be a sentence of probation, not a sentence of imprisonment. This conclusion should not be considered to be an indication of what this Court is likely to do if the Third Circuit accepts defendant's contention. Rather, it means only that the Court cannot say with certainty that defendant would be sentenced to a term of imprisonment should the Third Circuit accept defendants argument. Defendant, therefore, has satisfied the *Miller* test for bail pending appeal on the Riccardi mail/wire fraud scheme.

## C. Counts 17 and 18—McCausland Wire Fraud Scheme

■ Defendant's third argument on appeal is that a routinely issued conforming-use zoning/use permit is not "property" for the purposes of federal wire fraud charges and should not have been convicted on these counts. Defendant was convicted of two wire fraud counts under 18 U.S.C. § 1343, in a sting operation relating to Maureen McCausland's supposed opening of a new brothel. Specifically, defendant was convicted of obtaining a zoning/use permit for a modeling business, when he knew the real purpose for McCausland's business.

Section 1343 provides as follows: "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises [shall be guilty of violating this section]." The crux of defendant's argument is that the zoning permits were not property, but rather "routine administrative authorizations." In support of the contention that this is a substantive issue without clear precedent, defendant points to *Cleveland v. United States*, —— U.S. ——, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), where the Supreme Court held that a video poker license is "not 'property' in the government regulator's hands". *Id.* at 371. In that case, the Court ruled that such a license is not property, in part because it is essentially an expression of a state's sovereign right to exclude applicants from running video poker operations. The license is a way to "permit, regulate, and tax private operators of the games." *Id.* at 372.

The government points to several cases in which courts have held that licenses are property. Specifically, the Supreme Court has held that a license that permits a person to engage in an occupation or business is property. *See Barry v. Barchi*, 443 U.S. 55, 64, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979) (state horse trainer's license); *Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (requiring a due process hearing in connection with suspension of a driver's license). Neither the Third Circuit nor the Pennsylvania courts have specifically decided whether zoning permits are property. The Third Circuit has held that the state has a property interest in unissued medical licenses. *See United States v. Martinez*, 905 F.2d 709 (3d Cir.1990). In *Cleveland*, however, the Supreme Court, in resolving a conflict in the Circuits, abrogated the Third Circuit decision in *Martinez*. *See Cleveland v. United States*, —— U.S. ——, 121 S.Ct. 365, 369, 148 L.Ed.2d 221.

There is some force to defendant's contention that, following *Cleveland*, zoning permits may not be considered property for the purposes of federal wire fraud charges. The Supreme Court's decision in *Cleveland* lends support to defendant's position. Thus the Court concludes defendant has raised a "substantial question of

law or fact" sufficient to satisfy the *Miller* test.

Should the Third Circuit determine that a zoning permit is not property for the purposes of the federal wire fraud statute, the requirements for conviction under § 1343 cannot be satisfied. Thus the Court believes that such a holding would be "likely to result in reversal or an order for a new trial."

## IV. CONCLUSION

By deciding that defendant has raised substantial questions of law or fact in his appeal, and deciding that, should the Third Circuit rule in defendant's favor, a new trial is likely to result, this Court does not mean to imply that it believes such an order is probable. *Miller* prohibits a trial court from engaging in "bookmaking"— trying to predict whether there is a 51 percent chance of reversal at the appellate level. Instead, *Miller* "construed the word 'likely' in subsection (b)(2) as 'going to the significance of the substantial issue to the ultimate disposition of the appeal.'" *United States v. Colletta,* 602 F.Supp. 1322, 1329 (E.D.Pa.1985) (citing *United States v. Miller,* 753 F.2d 19, 23 (3d Cir.1985)). Therefore, a question is "likely to result in reversal or an order for a new trial" if there is a significant chance that a contrary ruling by the appellate court would lead to a reversal of the judgment below. That is the rationale that led this Court to determine that defendant has satisfied the *Miller* standard for bail pending appeal.

For the foregoing reasons, defendant Frank Antico's Motion for Continued Release Pending Appellate Disposition is granted.